IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NEW DIRECTIONS TECHNOLOGY CONSULTING, LLC,<br><br>        Plaintiff,<br>    v.<br><br>ABBOTT LABORATORIES INC. and BIGFOOT BIOMEDICAL, INC.,<br><br>        Defendants. | C.A. No.<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff New Directions Technology Consulting, LLC ("New Directions" or "Plaintiff") brings this action for patent infringement against Defendants Abbott Laboratories Inc. ("Abbott Labs") and Bigfoot Biomedical, Inc. ("Bigfoot Biomedical") (collectively, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff New Directions is engaged in the business of providing connected healthcare product opportunities, such as telehealth and smart medical devices.

2.     New Directions' mMed™ patent portfolio, consisting of five U.S. patents granted between July 2010 and July 2012, covers medication outcome assistance and management of other smart healthcare products in patients' hands through medication telemanagement solutions, including many connected combination products, FDA-regulated dosage forms and medical devices.

3.     The mMed™ patent portfolio relates to technology that not only supports greater

1

adherence but also provides foundations for platforms and business systems addressing a fuller, richer scope of medication telemanagement issues. All the U.S. patents in the mMed™ patent portfolio extend the concepts of medication telemanagement to different inventions. In some, sensors are primarily in a device containing the drug. In others, sensors are primarily in a medication carrying case for such a device. Generally, the inventions involve a medication container or a case for a medication container communicating in various ways. The communication can be with a central facility, sometimes via a mobile device having a location sensor, or to a caregiver or to the party who is supposed to carry the medication container.

4.      The mMed™ patent claims cover providing vital information that could be made immediately available to patients as well as their medical professionals and caregivers. Algorithms in a communications device or elsewhere, in combination with sensed medication and patient information, provide stakeholders with decision tools. A central facility performs analyses, makes remote diagnoses and informs action as necessary.

5.      An advanced mobile medication management system, using technology protected by the mMed™ patent portfolio, can provide reminders to take medication or prompts to initiate the replenishment process, as well as, among other functions, automate identity of the patient and medication; verify dosing and initiate self-reports; integrate real-time usage data into medical records; deliver information to a central monitoring facility operated by medical professionals; facilitate communication with and support from healthcare professional; assist in real-time diagnosis and determination of appropriate treatment; and enable monitoring of patient condition and informing clinicians, patients and others before, during and after medication administration.

6.      This action arises under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*, resulting from Defendant Abbott Labs' unauthorized manufacture of, sale of, and offers to sell cardiac

2

pacemaker products, including at least the CardioMEMS HF System (the "CardioMEMS system"); AVEIR Leadless (the "AVEIR"), Assurity MRI (the "Assurity"), and Endurity (the "Endurity") pacemakers (together, the "Accused Pacemakers"); and the Merlin.Net patient care network (PCN) (collectively, the "Accused Pacemaker Products"); and (ii) glucose monitors, including at least the Freestyle Libre 2 glucose monitoring system (app and sensor) integrated with Abbott Labs' subsidiary Bigfoot Biomedical's smart insulin pen cap and marketed as the Bigfoot Unity Diabetes Management system (the "Accused Glucose Monitor") (together with the Accused Pacemaker Products, the "Accused Products"), in the United States, which infringe one or more claims of U.S. Patent Nos. 7,871,393 (the "393 Patent"), 8,044,778 (the "778 Patent"), 9,149,111 (the "111 Patent"), and 8,212,658 (the "658 Patent"). These patents are part of the mMed™ patent portfolio and owned by New Directions.

## THE PARTIES

7.     Plaintiff New Directions is a corporation organized under the laws of the State of Delaware and has a primary place of business in Potomac, MD.

8.     On information and belief, Defendant Abbott Labs is a corporation organized under the laws of the State of Delaware and has a primary place of business at 100 Abbott Park Road, Abott Park, IL 60064.

9.     On information and belief, Defendant Abbott Labs owns and operates the website at www.abbott.com.

10.     On information and belief, Defendant Bigfoot Biomedical is a corporation organized under the laws of the State of Delaware and has a primary place of business at 1820 McCarthy Blvd., Milpitas, CA 95035.

11.     On information and belief, Defendants are in the business of manufacturing products

for cardiovascular health and diabetes care.

12.    On information and belief, Defendants' products are marketed and sold to their customers through sales representatives located throughout the United States and online.

## JURISDICTION AND VENUE

13.    This is an action arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*.  Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

14.    This Court may properly exercise personal jurisdiction over Defendants because Defendants are incorporated in Delaware. On information and belief, Defendants also manufacture products that have been and are used, offered for sale, sold, and purchased in Delaware.

15.    Under 28 U.S.C. §§ 1391 and 1400, venue is proper in this judicial district at least because Defendants are incorporated in this district and, therefore, "reside" in this district.

## THE PATENTS-IN-SUIT

16.    U.S. Patent No. 7,871,393, entitled "Injection Device with Reporting Ability," was duly and legally issued by the United States Patent and Trademark Office (USPTO) on January 18, 2011.  A copy of U.S. Patent No. 7,871,393 is attached as Exhibit 1.

17.    U.S. Patent No. 8,044,778, entitled "Injection Device and Case with Reporting Ability," was duly and legally issued by the USPTO on October 25, 2011. A copy of U.S. Patent No. 8,044,778 is attached as Exhibit 2.

18.    U.S. Patent No. 8,149,111, entitled "Central Facility that Communicates with Portable Container via Mobile Device," was duly and legally issued by the USPTO on April 3, 2012. A copy of U.S. Patent No. 8,149,111 is attached as Exhibit 3.

19.    U.S. Patent No. 8,212,658, entitled "Product Container for Use with Device Capable

of Long-Range and Short-Range Communications," was duly and legally issued by the USPTO on July 3, 2012. A copy of U.S. Patent No. 8,212,658 is attached as Exhibit 4.

20.     New Directions is the lawful owner by assignee of all right, title and interest in and to U.S. Patent Nos. 7,871,393, 8,044,778, 8,149,111, and 8,212,658 (the "Asserted Patents").

21.     Abbott Labs and Bigfoot Biomedical were aware of New Directions' patent rights and the existence of the Asserted Patents since at least January 20, 2016 when New Directions' Managing Director, Napoleon Monroe, presented on the "Benefits of IP Partnering for Drug Delivery Telemanagement" at the Drug Delivery Partnerships conference.

22.     Upon information and belief, Abbott Labs and Bigfoot Biomedical representatives attended the presentation.

23.     On or about June 30, 2021, New Directions' Managing Director, Napoleon Monroe, published an article describing the Asserted Patents, titled "Patents are Important for Smart Healthcare Products," on www.ondrugdelivery.com.

24.     The ONdrugDelivery website provides readers from global pharma and biopharma companies, with the latest, most pertinent, high quality industry information, intelligence and insights about technologies, services and products the drug delivery sector is developing.

25.     Upon information and belief, Abbott Labs and Bigfoot Biomedical were subscribers to ONdrugDelivery.

26.      Based on the foregoing, Abbott Labs and Bigfoot Biomedical are willful infringers of the Asserted Patents.

## THE INFRINGING PRODUCTS

27.      Abbott Labs manufactures, sells and offers to sell the Accused Products through  sales representatives  located  throughout  the  United  States and online.

28. Attached hereto as Exhibit 5 is a true and correct screenshot of a portion of Abbott Labs' website which allows customers to find sales representatives for the Accused Products based on their location.

29. Attached hereto as Exhibit 6 are true and correct images of Defendants' Accused Products.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 7,871,393

30. The preceding paragraphs are incorporated by reference as if fully restated herein.

31. By manufacturing, selling, and offering to sell the Accused Glucose Monitor, Defendants have infringed and are continuing to infringe at least claim 1 of the 393 Patent.

32. Claim 1 of the 393 Patent recites:

> What is claimed is:
> **1.** A central facility comprising:
> a communications interface for receiving a signal relating
>     to an injector, the signal indicating that the injector is not
>     being carried by a person associated with the injector,
>     the signal resulting from a comparison at the injector of
>     two location reports of the injector,
> a database for storing a record relating to the injector, the
>     record indicating the contents of the injector, an identity
>     of the person associated with the injector, and a contact
>     method for contacting the person to provide a reminder
>     to carry the injector, and
> means for generating a reminder to carry the injector,
>     according to the contact method, in response to the signal
>     indicating that the injector is not being carried by the
>     person associated with the injector.

33. The Accused Glucose Monitor embodies every element of claim 1 of the 393 Patent, literally or under the doctrine of equivalents.

34. The Accused Glucose Monitor has a central facility, comprising a communication interface for receiving a signal relating to an injector. Bigfoot Biomedical's website describes a

central facility as an app and online portal (Bigfoot Clinic Hub) for enabling ongoing, continual care of diabetes patients. Bigfoot Clinic Hub is a secure online portal that enables healthcare providers to provide individualized, continual care remotely and track their population of multiple daily injection patients under the Bigfoot Unity Program. The pen cap in combination with the insulin pen provides an injector. The cap automatically captures and uploads glucose and dosing time data to a central facility accessible to the patient and health care provider. The dosing recommendations appear on the pen cap's digital screen and are based on instructions from the user's health care provider through the central facility. Through the Bigfoot Unity Mobile App, the sensor also connects to a patient's smartphone, displaying current glucose range and history. The Bigfoot Unity Mobile App uses Bluetooth communications with the sensor and caps.

35.    The Accused Glucose Monitor includes a database at the central facility to store glucose readings, dosage recommendations and the identity of the person associated with the injector.

36.    The Accused Glucose Monitor signal indicates that the injector is not being carried by the person associated with the sensor and smartphone. The central facility will be informed that the injector is out of range and send alerts to a patient's smartphone to remind them to carry the injector.

37.    Data exchanged between the smartphone, sensor and injector enables the smartphone to identify the user registered at the central facility. Bluetooth® communications between the sensor, caps and the App let the patient see their glucose range and receive real-time alerts in the App and update settings on their caps.

38.    The Accused Glucose Monitor embodies every element of claim 1 of the 393 Patent, literally or under the doctrine of equivalents.

## COUNT II- INFRINGEMENT OF U.S. PATENT NO. 8,044,778

39.    The preceding paragraphs are incorporated by reference as if fully restated herein.

40.    By manufacturing, selling, and offering to sell the Accused Products, Defendants have infringed and are continuing to infringe at least claim 1 of the 778 Patent.

41.    Claim 1 of the 778 Patent recites:

What is claimed is:
**1.**  A container for a product, comprising:
a location circuit for determining the location of the container,
a storage element for storing an access code for a central
    facility, and a container identification code,
a plurality of data acquisition components for acquiring
    status of at least two characteristics of at least one of the
    container, the product and a user of the product, one of
    the characteristics indicating use of the product, and
a communication interface for generating and sending an
    event communication signal including
(a) the access code for the central facility,
(b) the container identification code from the storage element,
(c) the location of the container from the location circuit,
    and
(d) the status of the at least two characteristics from the data
    acquisition components.

42.    Claim 9 of the 778 Patent recites:

**9.** A container for a product, comprising:
a location circuit for determining the location of the container,
a storage element for storing an access code for a central
    facility, and a container identification code,
a plurality of data acquisition components for acquiring
    status of at least two characteristics of at least one of the
    container, the product and a user of the product, at least
    one of the characteristics indicating lack of use of at least
    one of the container and the product, and
a communication interface for generating and sending an
    event communication signal including
(a) the access code for the central facility,
(b) the container identification code from the storage element,
(c) the location of the container from the location circuit,
    and
(d) the status of the at least two characteristics from the data
    acquisition components.

43.    Claim 11 of the 778 Patent recites:

**11.** A container for a product, the container for use with an

external device having a long-range communication capability
and a short-range communication capability and location sensing
capability, comprising:
  a status indicator for indicating whether the product has
    been used,
  a storage element for storing an access code for a central
    facility, and a container identification code,
  a plurality of data acquisition components for acquiring
    status of at least two characteristics of at least one of the
    container, the product and a user of the product,
  a local communication interface for communicating with
    the external device using the short-range communication
    capability of the external device, and
  a processor for producing information and directing the
    local communication interface to send the information
    to the external device, the information including:
  (a) the access code for the central facility,
  (b) the container identification code,
  (c) the status of at least two characteristics from the data
    acquisition components,
  (d) instructions for the external device to use its location
    sensing capability to sense its location and report its
    sensed location to the central facility along with (b) and
    (c), using its long-range communication capability and
    (a).

44.    Claim 23 of the 778 Patent recites:

**23.** A container for a product, the container for use with an
external device having a long-range communication capability
and a short-range communication capability and location sensing
capability, comprising:
  a storage element for storing an access code for a central
    facility and a container identification code,
  a plurality of data acquisition components for acquiring
    status of at least two characteristics of at least one of the
    container, the product and a user of the product,
  a local communication interface for communicating with
    the external device using the short-range communication
    capability of the external device, and
  a processor for producing information and directing the
    local communication interface to send the information
    to the external device, the information including:
  (a) the access code for the central facility,
  (b) the container identification code,
  (c) the status of at least two characteristics from the data
    acquisition components,

(d) instructions for the external device to use its location
    sensing capability to sense its location and report its
    sensed location to the central facility along with (b) and
    (c), using its long-range communication capability and
    (a),

a control switch,

wherein the processor is also for directing the local communication
    device to send a signal to the external device
    to activate its long-range communication capability, the
    signal indicating that the control switch has been activated.

45.    Claim 25 of the 778 Patent recites:

**25.** A container for a product, comprising:

a status indicator for indicating whether the product has
    been used,

a location circuit for determining the location of the container,

a storage element for storing an access code for a central
    facility, and a container identification code,

a plurality of data acquisition components for acquiring
    status of at least two characteristics of at least one of the
    container, the product and a user of the product, and

a communication interface for generating and sending an
    event communication signal including

(a) the access code for the central facility,

(b) the container identification code from the storage element,

(c) the location of the container from the location circuit,
    and

(d) the status of the at least two characteristics from the data
    acquisition components.

46.    Claim 27 of the 778 Patent recites:

**27.** A container for a product, comprising:

a location circuit for determining the location of the container,

a storage element for storing an access code for a central
    facility, and a container identification code,

a plurality of data acquisition components for acquiring
    status of at least two characteristics of at least one of the
    container, the product and a user of the product, and

a communication interface for generating and sending an
    event communication signal including

(a) the access code for the central facility,

(b) the container identification code from the storage element,

(c) the location of the container from the location circuit,
    and

(d) the status of the at least two characteristics from the data

acquisition components, wherein the communication interface is also for generating and sending an exception signal indicating that a user of the container requests communication.

47. Claim 29 of the 778 Patent recites:

**29.** A container for a product, comprising:
a control switch,
a location circuit for determining the location of the container,
a storage element for storing an access code for a central facility, and a container identification code,
a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, and
a communication interface for generating and sending an event communication signal including
(a) the access code for the central facility,
(b) the container identification code from the storage element,
(c) the location of the container from the location circuit, and
(d) the status of the at least two characteristics from the data acquisition components,
wherein the communication interface is also for generating and sending an exception signal indicating that the control switch has been activated.

**The Accused Glucose Monitor**

48. The Accused Glucose Monitor embodies every element of claim 1 of the 778 Patent, literally or under the doctrine of equivalents.

49. The pen caps in combination with the insulin pen form a smart container for a product.

50. The RFID or chip in the container includes location sensing capabilities for determining the location of the container.

51. The Accused Glucose Monitor includes an online portal (Bigfoot Clinic Hub) and an App which stores an access code for the central facility and a container identification code. This enables the caps to upload glucose and dosing time data to the Bigfoot Clinic Hub.

52.    The Accused Glucose Monitor enables the container to identify the user registered at the central facility and the product contained within the insulin pen inserted within the cap. At least, the caps display insulin names and track how long it has been since the last insulin dose using the pen; and two characteristics of the product, one indicating use of the product.

53.    The Accused Glucose Monitor has a communication interface for generating and sending an event communication signal. Data sharing between the App and the caps communicates relevant therapy-specific information, therapy recommendations or when it is time to take an insulin dose from a pen.

54.    The patient's smartphone transmits an access code to access the secure online portal.

55.    The cap's RFID or chip communicates the container's identification code and information to the App.

56.    The RFID or chip of the container communications with the Smartphone which includes location sensing capabilities.

57.    The MY DEVICES screen in the App communicates the status of current connected Bigfoot Unity devices, including at least two characteristics from the data acquisition components.

58.    The Accused Glucose Monitor embodies every element of claim 9 of the 778 Patent, literally or under the doctrine of equivalents.

59.    The Accused Glucose Monitor enables the container to identify the user registered at the central facility and the product contained within the insulin pen inserted within the cap. At least, the caps display insulin names and track how long it has been since the last insulin dose using the pen; and two characteristics of the product, one indicating use or lack of use of the product.

60.    The Accused Glucose Monitor embodies every element of claim 11 of the 778 Patent, literally or under the doctrine of equivalents.

61.     The Accused Glucose Monitor is for use with an external device (smartphone) having long and short-range communication capability, and location sensing capability running the Bigfoot Unity Mobile App.

62.     The Accused Glucose Monitor has a processor for producing information and directing the local communication interface to send the information to the smartphone, including instructions for the smartphone to use its location sensing capability to sense its location and report that location to the central facility along with the container identification code and the status of at least two characteristics from the data acquisition components using its long-range communication capabilities and the access code for the central facility.

63.     The Accused Glucose Monitor embodies every element of claim 23 of the 778 Patent, literally or under the doctrine of equivalents.

64.     The Accused Glucose Monitor, including sensors, caps and pens, and the external device (smartphone) has short-range communication capability.

65.     Upon information and belief, the Accused Glucose Monitor has a control switch for directing the local communication device (sensors, caps and pens) to send a signal to the smartphone to activate its long-range communication capability and indicate that the control switch has been activated.

66.     The Accused Glucose Monitor embodies every element of claim 25 of the 778 Patent, literally or under the doctrine of equivalents.

67.     The Accused Glucose Monitor has a status indicator for indicating whether the product has been used because the caps communicate the last time the product has been used.

68.     The Accused Glucose Monitor embodies every element of claim 27 of the 778 Patent, literally or under the doctrine of equivalents.

69.     Upon information and belief, the Bigfoot Unity Mobile App can generate and send an exception signal that the user of the container requests communication.

70.     The Accused Glucose Monitor embodies every element of claim 29 of the 778 Patent, literally or under the doctrine of equivalents.

71.     The Accused Glucose Monitor has a control switch.

72.     The Bigfoot Unity Mobile App can generate and send an exception signal that the control switch has been activated.

**The Accused CardioMEMS HF System**

73.     Abbott Labs' CardioMEMS system (the "Accused CardioMEMS system") communicates data to a central facility (the Merlin.Net PCN) via an external device (e.g., a smartphone or the Merlin@home transmitter).

74.     The Accused CardioMEMS system embodies every element of claim 1 of the 778 Patent, literally or under the doctrine of equivalents.

75.     Abbott Labs' CardioMEMS has a container for a product. The CardioMEMS is an implantable device with a wireless sensor. A container houses at least components of the wireless sensor. An accompanying USB flash drive is provided in a sensor box. The sensor and USB flash drive together form a product.

76.     At least a portion of the wireless sensor is housed within a container. The implantable device communicates via the sensor and an antenna with a Patient Electronics System (PES) (one of the system components of the CardioMEMS System, e.g., Merlin@home transmitter) which has long-range and short-range communication capabilities. The PES also has location sensing capabilities for sensing the location of the container of the implantable device within the patient via the signals emitted by the antenna and received by the PES.

77.    The Merlin.net™ PCN, a central facility, is a remote follow-up system that imports and manages cardiac information for patients who have Abbott Labs' implanted devices.

78.    The CardioMEMS sensor can emit signals for use in determining the container's location within the patient.

79.    Each container of the CardioMEMS device has a flash memory or storage element that stores an access code for the Merlin.net PCN or Abbott's central facility, and a container identification code associated with the container of the implantable device.

80.    The CardioMEMS sensor is equivalent to a plurality of sensors or data acquisition components since the sensor is capable of sensing a plurality of data readings, including acquiring the status of at least two characteristics of the container (i.e., whether the components within the container are emitting RF signals), the product (i.e., the implantable device and its RF sensor are positioned within the pulmonary artery of the patient), and a user of the product or implantable device (i.e., PA readings corresponding to the user). The characteristic of the sensor of the implantable device, emitting RF signals, read by the PES and Hospital Electronic System (HES) indicates use of the product or implantable device.

81.    Each container of the CardioMEMS devices houses a portion of a communication interface for generating and sending an event communication signal (e.g., PA readings) sensed by the sensor, such as, when interfacing or communicating with the Merlin@home transmitter or smartphone to send information (e.g., PA readings) to the Merlin.net PCN. The communication interface generates and sends an event communication signal which, when it is received by the Merlin.net PCN, provides an indication that the implantable device within the patient is in communication with the Merlin.net PCN via the Melin@home transmitter or smartphone.

82.    The communication interface of the CardioMEMS System also communicates with

the HES during the set up procedure.

83.    The CardioMEMS System requires the transmission of an access code for the central facility or the Merlin.net PCN to be accessed and information to be transmitted or accessed. Each container of Abott Lab's CardioMEMS device includes or is associated with an access code (e.g., serial number).

84.    Each container includes or is associated with a container identification code stored within the USB flash drive (e.g., unique calibration information or code).

85.    The wireless sensor of which a portion thereof is housed by the container of Abott Labs' CardioMEMS device transmits signals that provide location information, i.e., the location of the container within the user.

86.    Abbott Labs' CardioMEMS device has a wireless sensor that transmits signals that communicate the status of at least two characteristics.

87.    The CardioMEMS System includes a PA sensor which transmits PA readings and other data via the smartphone or Merlin@home transmitter to the central facility or Merlin.net PCN, such as, for intermittent assessment of pulmonary artery systolic, diastolic and mean pulmonary artery pressures, whether the user is providing regular readings to the central facility, and if the product or PA sensor is being used to monitor PA pressure.

88.    The Accused CardioMEMS system embodies every element of claim 9 of the 778 Patent, literally or under the doctrine of equivalents.

89.    At least one of the characteristics of the sensor of the implantable device is emitting RF signals that are read by the PES and HES; those RF signals indicate lack of use of the product or implantable device.

90.    The Accused CardioMEMS system embodies every element of claim 11 of the 778

Patent, literally or under the doctrine of equivalents.

91.     The Accused CardioMEMS device has an external device having a long-range communication capability and a short-range communication capability and location sensing capability.

92.     The Accused CardioMEMS device has a status indicator for indicating whether the product has been used.

93.     The Accused CardioMEMS device has a local communication interface for communicating with the external device using the short-range communication capability of the external device.

94.     The Accused CardioMEMS device has a processor for producing information and directing the local communication interface to send the information to the external device, including instructions for the external device to use its location sensing capability to sense its location and report its sensed location to the central facility along with the container identification code and the status of at least two characteristics from the data, using its long-range communication capability and the access code for the central facility.

95.     The Accused CardioMEMS system embodies every element of claim 23 of the 778 Patent, literally or under the doctrine of equivalents.

96.     The Accused CardioMEMS device has a control switch.

97.     The Accused CardioMEMS device has a processor for producing information and directing the local communication interface to send the information to the external device. The processor is also for directing the local communication device to send a signal to the external device to activate its long-range communication capability, the signal indicating that the control switch has been activated.

98.     The Accused CardioMEMS system embodies every element of claim 25 of the 778 Patent, literally or under the doctrine of equivalents.

99.     The Accused CardioMEMS device has a location circuit for determining the location of the container from the location circuit.

100.    The Accused CardioMEMS system embodies every element of claim 27 of the 778 Patent, literally or under the doctrine of equivalents.

101.    The CardioMEMS communication interface is also for generating and sending an exception signal indicating that a user of the container requests communication.

102.    The Accused CardioMEMS system embodies every element of claim 29 of the 778 Patent, literally or under the doctrine of equivalents.

103.    The CardioMEMS communication interface is also for generating and sending an exception signal indicating that the control switch has been activated.

**The Accused Pacemakers**

104.    Abbott Labs' Accused Pacemakers include a container for housing the various components of the pacemaker, including the cardiac pulse generator. The pacemaker is the product.

105.    The Accused Pacemakers include a processor having a memory, the storage element for storing an access code for Merlin.Net PCN, and an identification code for the container housing the various components of the pacemaker.

106.    Each container housing the components of the pacemaker also has a corresponding container identification code (e.g., UDI number) stored in the storage element or memory identifying the pacemaker. A portion of the UDI number may include a unique serial number, the access code.

107.    The Accused Pacemakers include components (such as sensors and sensing circuits)

housed within the container for acquiring the status of at least two characteristics of at least one of the container housing the various components of the pacemaker (i.e., the product), and the user of the pacemaker. The characteristics include whether the user's heartbeat was slow which necessitated pacing by the cardiac pulse generator indicating use of the product.

108.    The Accused Pacemakers include a communication interface or circuitry housed within the container for generating and sending a communication signal to the mobile device and/or Merlin@home transmitter. The communication signal can be an event communication signal indicative of a pacing or other event.

109.    The access code along with the patient usage data is transmitted by the Accused Pacemakers via the event communication signal. The access code is for accessing the central facility or Merlin.net PCN to identify the pacemaker.

110.    The event communication signal transmitted by the Accused Pacemakers also includes an identification code identifying the container which houses the circuitry of the pacemaker transmitting the communication signal.

111.    The event communication signal transmitted by the Accused Pacemakers also includes location-based information of the container. The location of the container is also indicated based on the container identification code which correlates to the user of the pacemaker.

112.    The Accused Pacemakers transmit event communication signals indicating the status of at least two characteristics from the data acquisition components, the sensed and usage data.

**The Accused AVEIR Leadless Pacemaker**

113.    As alleged above, the accused AVEIR pacemaker embodies every element of claim 1 of the 778 Patent, literally or under the doctrine of equivalents.

114.    The accused AVEIR pacemaker uses inductive telemetry for transmitting signals for

determining the container location.

115.    As alleged above, the accused AVEIR pacemaker embodies every element of claim 9 of the 778 Patent, literally or under the doctrine of equivalents.

116.    As alleged above, the accused AVEIR pacemaker embodies every element of claim 11 of the 778 Patent, literally or under the doctrine of equivalents.

117.    As alleged above, the accused AVEIR pacemaker embodies every element of claim 23 of the 778 Patent, literally or under the doctrine of equivalents.

118.    As alleged above, the accused AVEIR pacemaker embodies every element of claim 25 of the 778 Patent, literally or under the doctrine of equivalents.

119.    As alleged above, the accused AVEIR pacemaker embodies every element of claim 27 of the 778 Patent, literally or under the doctrine of equivalents.

120.    As alleged above, the accused AVEIR pacemaker embodies every element of claim 29 of the 778 Patent, literally or under the doctrine of equivalents.

**The Accused Assurity MRI Pacemaker**

121.    As alleged above, the accused Assurity pacemaker embodies every element of claim 1 of the 778 Patent, literally or under the doctrine of equivalents.

122.    The accused Assurity MRI pacemaker includes InvisiLink™ wireless RF telemetry, which is the location circuit, and works in tandem with the myMerlinPulse app that allows for determining the location of the container of the housing enclosing the various components of the pacemaker, including the cardiac pulse generator.

123.    The myMerlinPulse app provides remote monitoring capability of the pacemaker by transmitting information from the pacemaker using the device's communication circuitry to the patient's healthcare provider. The App uses an internet connection through a WiFi or cellular network

to send information about a pacemaker to a patient's healthcare provider.

124.    As alleged above, the accused Assurity pacemaker embodies every element of claim 9 of the 778 Patent, literally or under the doctrine of equivalents.

125.    As alleged above, the accused Assurity pacemaker embodies every element of claim 11 of the 778 Patent, literally or under the doctrine of equivalents.

126.    As alleged above, the accused Assurity pacemaker embodies every element of claim 23 of the 778 Patent, literally or under the doctrine of equivalents.

127.    As alleged above, the accused Assurity pacemaker embodies every element of claim 25 of the 778 Patent, literally or under the doctrine of equivalents.

128.    As alleged above, the accused Assurity pacemaker embodies every element of claim 27 of the 778 Patent, literally or under the doctrine of equivalents.

129.    As alleged above, the accused Assurity pacemaker embodies every element of claim 29 of the 778 Patent, literally or under the doctrine of equivalents.

**The Accused Endurity Pacemaker**

130.    As alleged above, the accused Endurity pacemaker embodies every element of claim 1 of the 778 Patent, literally or under the doctrine of equivalents.

131.    As alleged above, the accused Endurity pacemaker embodies every element of claim 9 of the 778 Patent, literally or under the doctrine of equivalents.

132.    As alleged above, the accused Endurity pacemaker embodies every element of claim 11 of the 778 Patent, literally or under the doctrine of equivalents.

133.    As alleged above, the accused Endurity pacemaker embodies every element of claim 23 of the 778 Patent, literally or under the doctrine of equivalents.

134.    As alleged above, the accused Endurity pacemaker embodies every element of claim

25 of the 778 Patent, literally or under the doctrine of equivalents.

135.    As alleged above, the accused Endurity pacemaker embodies every element of claim

27 of the 778 Patent, literally or under the doctrine of equivalents.

136.    As alleged above, the accused Endurity pacemaker embodies every element of claim

29 of the 778 Patent, literally or under the doctrine of equivalents.

137.    At a minimum, the Accused Products infringe claims 1, 9, 11, 23, 25, 27 and 29 of the

778 Patent either literally or under the doctrine of equivalents.

## COUNT III- PATENT INFRINGEMENT OF U.S. PATENT NO. 8,149,111

138.    The preceding paragraphs are incorporated by reference as if fully restated herein.

139.    By manufacturing, selling, and offering to sell the Accused Products, Defendants have

infringed and are continuing to infringe at least claim 1 of the 111 Patent.

140.    Claim 1 of the 111 Patent recites:

> What is claimed is:
> **1.**   A method for a central facility to communicate with a portable container via a mobile device, comprising:
> > receiving, at a computer at the central facility, usage data in association with identification tag information for the portable container, from the mobile device associated with the portable container, the usage data generated by a usage sensor in the portable container
> > receiving, at the computer at the central facility, environmental data from the mobile device associated with the portable container, the environmental data generated by an environmental sensor,
> > receiving, at the computer at the central facility, patient data from the mobile device associated with the portable container, the patient data generated by a patient sensor,
> > storing, at the computer at the central facility, the usage data, the environmental data and the patient data in a record associated with the identification tag information,
> > analyzing, at the computer at the central facility, the usage date, the environmental data and the patient data relative to a situational rule, to determine an action,
> > sending, from the computer at the central facility, action

> data to the mobile device associated with the portable
> container,
>
> sending, from the computer device at the central facility, notice
> data to a third party in accordance with a notification
> rule, and
>
> storing, at the computer at the central facility, the action
> data and the notice data in the record associated with the
> identification tag information.

**The Accused Glucose Monitor**

141.    The central facility of the Accused Glucose Monitor, the secure online portal Bigfoot Clinic Hub, communicates with the portable smart container, the pen cap and insulin pen, via a smartphone or mobile device, according to the claimed methods.

142.    The Accused Glucose Monitor also includes a temperature sensor that generates environmental data received from the smartphone or mobile device, stored and analyzed at the central facility.

143.    The Accused Glucose Monitor can send action data to the smartphone or mobile device associated with the portable container, or notice data to a third party, such data is associated with the identification tag information.

144.    The Accused Glucose Monitor embodies every element of claim 1 of the 111 Patent, literally or under the doctrine of equivalents.

**The Accused Pacemakers**

145.    Abbott Labs operates a central facility, the Merlin.Net PCN, for enabling physicians and other healthcare providers to receive data transmitted by a pacemaker (portable container) in the field via smartphone or mobile device.

146.    Abbott Labs' mobile application, the myMerlinPulse™, is intended for use by patients who have an Abbott Labs'implanted heart device and access to a mobile device. The App provides remote monitoring capability of the device by transmitting information from the patient's implanted

heart device, using the device's communication circuitry, to the patient's healthcare provider or central facility. The App uses an internet connection through a WiFi or cellular network to send information about the patient's implanted heart device to the patient's healthcare provider.

147.    Abbott Labs receives at its central facility, Merlin.Net PCN, from the smartphone or mobile device associated with the pacemaker, usage data corresponding to a pacemaker in the field. Each pacemaker also has a container identification code or tag (e.g., UDI number) stored in the storage element or memory identifying the pacemaker. Every Abbott Labs pacemaker includes components/sensors for acquiring and transmitting usage and other data to the mobile device and the central facility.

148.    Abbott Labs receives at its central facility, Merlin.Net PCN, from the smartphone or mobile device associated with the pacemaker, location data generated by a location sensor of the mobile device. The location data is generated by sensors in the mobile device. Location data is classified as environmental data.

149.    Abbott Labs receives at its central facility, Merlin.Net PCN, from the smartphone or mobile device associated with the pacemaker, patient data generated by a patient sensor. This and other patient data is sensed by one or more sensors of the pacemaker. For example, the pacemaker remotely communicates information about the patient's cardiac activity, such as heart rate and rhythm, to the central facility or healthcare provider via the smartphone or mobile device.

150.    Abbott Labs' central facility or Merlin.Net PCN stores the data received from the mobile device, including the usage data, the environmental data and the patient data in a record associated with the patient. The correct patient is identified via the identification tag information transmitted by the mobile device to the central facility. The identification tag information enables the central facility to correlate the incoming data with the corresponding patient.

151.    Merlin.Net PCN analyzes the usage data, the environmental data and the patient data received from the mobile device to a set of protocols or situational rules to determine an action, such as message the patient to schedule an appointment or transmit data. The patient's healthcare provider can access patient information through the Merlin.Net PCN website, remotely monitor and assess patient device data, and analyze the data and determine an action (e.g., level of care needed).

152.    Healthcare providers can use Abbott Labs' Merlin.Net PCN, including DirectCall™ messaging, to send action data to the smartphone associated with the portable container or pacemaker.

153.    Abbott Lab's central facility, Merlin.Net PCN, sends notice data or a notification to a third party, such as a healthcare provider, in accordance with a notification rule present at the central facility by the healthcare provider. The App can automatically collect relevant data from a patient's pacemaker and send it to their healthcare provider.

154.    Abbott Labs' central facility, Merlin.Net PCN, stores the action data and the notice data (e.g., alerts) in the record associated with the patient and with the identification tag information received from the mobile device.

155.    As alleged above, the accused CardioMEMS system embodies every element of claim 1 of the 111 Patent, literally or under the doctrine of equivalents.

156.    As alleged above, the accused AVEIR pacemaker embodies every element of claim 1 of the 111 Patent, literally or under the doctrine of equivalents.

157.    As alleged above, the accused Assurity pacemaker embodies every element of claim 1 of the 111 Patent, literally or under the doctrine of equivalents.

158.    As alleged above, the accused Endurity pacemaker embodies every element of claim 1 of the 111 Patent, literally or under the doctrine of equivalents.

159.    As alleged above, the accused Merlin.Net PCN embodies every element of claim 1 of

the 111 Patent, literally or under the doctrine of equivalents.

160.    At a minimum, the Accused Products infringe claim 1 of the 111 Patent either literally

or under the doctrine of equivalents.

## COUNT IV- PATENT INFRINGEMENT OF U.S. PATENT NO. 8,212,658

161.    The preceding paragraphs are incorporated by reference as if fully restated herein.

162.    By manufacturing, selling, and offering to sell the Accused Products, Defendants have

infringed and are continuing to infringe at least claim 1 of the 658 Patent.

163.    Claim 1 of the 658 Patent recites:

> What is claimed is:
> **1.**  A container for a product, the container for use with an
> external device having long-range communication capability
> and short-range communication capability and location sensing
> capability, comprising:
>   a storage element for storing an access code for a central
>     facility and a container identification code,
>   a first data acquisition component for detecting that the
>     container has been opened,
>   a second data acquisition component for sensing an identity
>     of a nearby person, the nearby person being a member
>     of a group registered at a central facility, the container
>     identification code not uniquely associated with a
>     member of the group,
>   a third data acquisition component for sensing use of the
>     product,
>   a local communication interface for communicating with
>     the external device using the short-range communication
>     capability of the external device, and
>   a processor for producing information and directing the
>     local communication interface to send the information
>     to the external device, the information including:
>   (a) the access code for the central facility,
>   (b) the container identification code,
>   (c) the detection that the container has been opened,
>   (d) the sensed use of the product,
>   (e) the sensed identity of the nearby person, and
>   (f)  instructions for the external device to use its location
>     sensing capability to sense its location and to report its
>     sensed location to the central facility (original).

**The Accused Glucose Monitor**

164.    The Accused Glucose Monitor embodies every element of claim 1 of the 658 Patent, literally or under the doctrine of equivalents.

165.    The Accused Glucose Monitor has a data acquisition component for detecting that the container has been opened.

166.    Upon information and belief, the Accused Glucose Monitor has a processor for producing information and directing the local communication interface, the pen, cap and sensor, to send information to the smartphone, including, among other listed information, that the container has been opened.

167.    The Accused Glucose Monitor also has a data acquisition component for sensing the identity of a nearby person, a member of a group registered at a central facility; the container has identifying information not uniquely associated with a member of the group.

168.    The Accused Glucose Monitor also has a data acquisition component for sensing use of the product.

169.    The Accused Glucose Monitor embodies every element of claim 1 of the 658 Patent, literally or under the doctrine of equivalents.

170.    Claim 9 of the 658 Patent recites:

> **9.** A container for a product, the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising:
>    a storage element for storing an access code for a central facility and a container identification code,
>    a first data acquisition component for detecting that the container has been opened,
>    a second data acquisition component for sensing an identity of a nearby person, the nearby person being a member of a group registered at a central facility, the container identification code not uniquely associated with a

member of the group,
a local communication interface for communicating with
the external device using the short-range communication
capability of the external device, and
a processor for producing information and directing the
local communication interface to send the information
to the external device, the information including:
(a) the access code for the central facility,
(b) the container identification code,
(c) the detection that the container has been opened,
(d) the sensed identity of the nearby person, and
(e) instructions for the external device to use its location
sensing capability to sense its location and to report its
sensed location to the central facility.
wherein the external device has a sensor communication
interface for communicating with an external sensor to
receive a reading, and wherein the processor is also for
directing the local communication device to send an
instruction to the external device to send the reading
from the external sensor to the central facility.

171. The Accused Glucose Monitor embodies every element of claim 9 of the 658 Patent, literally or under the doctrine of equivalents.

172. The Accused Glucose Monitor has an external device, a smartphone, that has a local communication interface with an external sensor to receive a reading.

173. Upon information and belief, the Accused Glucose Monitor has a processor for directing the local communication device to send an instruction to the external device to send the reading from the external sensor to the central facility.

174. The Accused Glucose Monitor embodies every element of claim 9 of the 658 Patent, literally or under the doctrine of equivalents.

175. Claim 11 of the 658 Patent recites:

**11.** A container for a product, the container for use with an
external device having long-range communication capability
and short-range communication capability and location sensing
capability, comprising:

a storage element for storing an access code for a central
    facility and a container identification code,
a switch for activation by a user to produce an activation
    signal,
a data acquisition component for sensing an identity of a
    nearby person, the nearby person being a member of a
    group registered at a central facility, the container identification
    code not uniquely associated with a member of the group,
a data acquisition component for sensing use of the prod-
    uct,
a local communication interface for communicating with
    the external device using the short-range communication
    capability of the external device, and
a processor for producing information and directing the
    local communication interface to send the information
    to the external device, the information including:
(a) the access code for the central facility,
(b) the container identification code,
(c) the activation signal,
(d) the sensed identity of the nearby person,
(e) the sensed use of the product, and
(f) instructions for the external device to use its location
    sensing capability to sense its location and to report its
    sensed location to the central facility.

176.    The Accused Glucose Monitor embodies every element of claim 11 of the 658 Patent,

literally or under the doctrine of equivalents.

177.    Upon information and belief, the Accused Glucose Monitor has a switch for activation

by a user to produce an activation signal.

178.    Upon information and belief, the Accused Glucose Monitor has a processor for

producing information and directing the local communication interface to send the information,

including the activation signal, to the external device.

179.    The Accused Glucose Monitor embodies every element of claim 11 of the 658 Patent,

literally or under the doctrine of equivalents.

180.    Claim 17 of the 658 Patent recites:

**17.** A container for a product, the container for use with an

external device having long-range communication capability
and short-range communication capability and location sensing
capability, comprising:
   a storage element for storing an access code for a central
     facility and a container identification code,
   a switch for activation by a user to produce an activation
     signal,
   a data acquisition component for sensing an identity of a
     nearby person, the nearby person being a member of a
     group registered at a central facility, the container identification
     code not uniquely associated with a member of the group,
   a local communication interface for communicating with
     the external device using the short-range communication
     capability of the external device, and
   a processor for producing information and directing the
     local communication interface to send the information
     to the external device, the information including:
   (a) the access code for the central facility,
   (b) the container identification code,
   (c) the activation signal,
   (d) the sensed identity of the nearby person, and
   (e) instructions for the external device to use its location
     sensing capability to sense its location and to report its
     sensed location to the central facility,
   wherein the external device is a practice management system
     for at least one of dentistry and medicine.

181.    The Accused Glucose Monitor embodies every element of claim 17 of the 658 Patent, literally or under the doctrine of equivalents.

182.    The Accused Glucose Monitor has an external device that is a practice management system for medicine.

183.    The Accused Glucose Monitor embodies every element of claim 17 of the 658 Patent, literally or under the doctrine of equivalents.

**The Accused Pacemakers**

184.    Abbott Labs' Accused Pacemakers or products include a container for housing the various components of the pacemaker. The pacemaker is the product.

185.    Abbott Labs' Accused Pacemakers can be used with an external device, such as a

30

mobile device or smartphone, and the Merlin@home transmitter. The mobile device or smartphone and Merlin@home transmitter have long-range communication capability (such as internet communications) and short-range communication capability (such as Bluetooth, and inductive and RF telemetry). The smartphone or mobile device also has a location sensing capability via sensors in the smartphone or mobile device. Abbott Labs' Merlin@home transmitter is programmed with location information (e.g., the user's address).

186.    The container of each of Abbott Labs' Accused Pacemakers houses a processor having a memory, the storage element for storing an access code for Merlin.Net PCN, the central facility, and an identification code for the pacemaker. Each Accused Pacemaker is also associated with a container identification code (e.g., UDI number) stored in the storage element or memory, housed within the container, identifying the pacemaker. A portion of the UDI number may include the serial number, the access code.

187.    The container housing the various components of Abbott Labs' Accused Pacemakers also houses a switch that can be remotely activated by a user to produce a signal for causing the circuitry of the pacemaker, also housed by the container, to perform a function, change its programmed settings etc.

188.    Each container of Abbott Labs' Accused Pacemakers also houses a data acquisition component for receiving data signals via the mobile device, smartphone or Merlin@home transmitter. The Accused Pacemakers also continuously collect or acquire data on cardiac events and carry out measurements by periodically measuring the amplitude of atrial signals. This information is then stored in the pacemaker memory for later retrieval and analysis. This data collection enables the pacemaker to sense the identity of a nearby person, i.e., the person implanted with the pacemaker and registered at the central facility. This person is associated with the mobile device, smartphone or

Merlin@home transmitter.

189.    Each user of Abbott Labs' Accused Pacemakers is a member of a group registered with Merlin.Net PCN, a central facility. The container identification code associated with a particular container for each of Abbott Labs' Accused Pacemakers is set during manufacturing of the container and is not uniquely associated with a member of the group registered at the central facility.

190.    Each container of Abbott Labs' Accused Pacemakers also houses a data acquisition component (e.g., electrode sensors) for sensing use of the product, e.g., the occurrence of a heart pacing event by the pacemaker.

191.    Each container of Abbott Labs' Accused Pacemakers also houses a communication interface or circuitry for communicating with the mobile device, smartphone and/or Merlin@home transmitter using the short-range communication capability of the mobile device, smartphone and/or Merlin@home transmitter (e.g., Bluetooth, and inductive or RF telemetry).

192.    Each container of Abbott Labs' Accused Pacemakers also houses a processor for producing information (e.g., usage information, and heart-related data or readings) and directing the local communication interface to send the information to the external device (e.g., smartphone or Merlin@home transmitter).

193.    The access code is transmitted by each of Abott Labs' Accused Pacemakers to the external device (e.g., mobile device, smartphone or Merlin@home transmitter).

194.    Circuitry housed within a container of each of Abbott Labs' Accused Pacemakers communicates to the external device the identification code identifying the container associated with the pacemaker.

195.    Circuitry housed within a container of each of Abbott Labs' Accused Pacemakers also communicates to the external device information about and occurrence of the activation signal

32

generated by the pacemaker which caused a particular function to occur, e.g., pacing of the heart by the pacemaker.

196.    Circuitry housed within a container of each of Abbott Labs' Accused Pacemakers also communicates to the external device the sensed identity of the user or nearby person.

197.    Circuitry housed within a container of each of Abbott Labs' Accused Pacemakers also communicates to the external device that the pacemaker has been used, e.g., to pace the heart.

198.    Circuitry housed within a container of each of Abbott Labs' Accused Pacemakers also communicates to the external device instructions to report or transmit the data to the central facility or Merlin.Net PCN, including sensing the external device's location (e.g., location of the mobile device using its location sensors or Merlin@home transmitter) and reporting its sensed location to the central facility.

199.    As alleged above, the accused CardioMEMS system embodies every element of claim 11 of the 658 Patent, literally or under the doctrine of equivalents.

200.    As alleged above, the accused CardioMEMS  system embodies every element of claim 17 of the 658 Patent, literally or under the doctrine of equivalents.

201.    As alleged above, the accused AVEIR pacemaker embodies every element of claim 11 of the 658 Patent, literally or under the doctrine of equivalents.

202.    As alleged above, the accused AVEIR pacemaker embodies every element of claim 17 of the 658 Patent, literally or under the doctrine of equivalents.

203.    As alleged above, the accused Assurity pacemaker embodies every element of claim 11 of the 658 Patent, literally or under the doctrine of equivalents.

204.    As alleged above, the accused Assurity pacemaker embodies every element of claim 17 of the 658 Patent, literally or under the doctrine of equivalents.

205.    As alleged above, the accused Endurity pacemaker embodies every element of claim 11 of the 658 Patent, literally or under the doctrine of equivalents.

206.    As alleged above, the accused Endurity pacemaker embodies every element of claim 17 of the 658 Patent, literally or under the doctrine of equivalents.

207.    As alleged above, the accused Merlin.Net PCN embodies every element of claim 11 of the 658 Patent, literally or under the doctrine of equivalents.

208.    As alleged above, the accused Merlin.Net PCN embodies every element of claim 17 of the 658 Patent, literally or under the doctrine of equivalents.

209.    At minimum, the Accused Products infringe claims 1, 9, 11 and 17 of the 658 Patent either literally or under the doctrine of equivalents.

## COUNT V- WILLFUL INFRINGEMENT OF THE ASSERTED PATENTS

210.    Abbott Labs and Bigfoot Biomedical were aware of New Directions' patent rights and the existence of the Asserted Patents since at least January 20, 2016, when New Directions' Managing Director, Napoleon Monroe, presented on the "Benefits of IP Partnering for Drug Delivery Telemanagement" at the Drug Delivery Partnerships conference.

211.    Upon information and belief, Abbott Labs and Bigfoot Biomedical representatives attended the presentation.

212.    On or about June 30, 2021, New Directions' Managing Director, Napoleon Monroe, published an article describing the Asserted Patents, titled "Patents are Important for Smart Healthcare Products", on www.ondrugdelivery.com.

213.    ONdrugDelivery provides its readers in global pharma and biopharma, with the latest, most pertinent, high quality industry information, intelligence and insights, about ideas, technologies, services and products the drug delivery sector is developing.

214.    Upon information and belief, Abbott Labs and Bigfoot Biomedical are subscribers to ONdrugDelivery.

215.    In the June 30, 2021 ONdrugDelivery article, Napoleon Monroe discusses the value of internet-connected smart devices in healthcare and introduced the mMed™ patent portfolio.

216.    The ONdrugDelivery article describes the inventions covered by the Asserted Patents.

217.    Based on the foregoing, Abbott Labs and Bigfoot Biomedical have been and continue to be willful infringers of the Asserted Patents.

218.    With knowledge of the 393, 778, 111 and 658 Patents and their own infringing conduct, Abbott Labs and Bigfoot Biomedical willfully continues to infringe the 393, 778, 111 and 658 Patents.

219.    New Directions is entitled to recover damages adequate to compensate for the infringement of the 393, 778, 111 and 658 Patents, as well as additional damages for willful infringement, including increased damages under 35 U.S.C. §284, and attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. §285.

220.    New Directions has been and continues to suffer irreparable harm by Abbott Labs' and Bigfoot Biomedical's infringement of its valuable patent rights.

221.    New Directions is without an adequate remedy at law and is entitled to an injunction against Abbott Labs' and Bigfoot Biomedical's continuing infringement of the 393, 778, 111 and 658 Patents.  Unless enjoined, preliminarily and permanently, Abbott Labs and Bigfoot Biomedical's will continue their infringing conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, New Directions prays for judgment against Defendants granting New

Directions relief as follows:

A.    That this Court adjudge and decree that Defendants have infringed and continue to infringe the 393 Patent by manufacturing, offering to sell and selling the Accused Products;

B.    That this Court adjudge and decree that Defendants have infringed and continue to infringe the 778 Patent by manufacturing, offering to sell and selling the Accused Products;

C.    That this Court adjudge and decree that Defendants have infringed and continue to infringe the 111 Patent by manufacturing, offering to sell and selling the Accused Products;

D.    That this Court adjudge and decree that Defendants have infringed and continue to infringe the 658 Patent by manufacturing, offering to sell and selling the Accused Products;

E.    That this Court grant preliminary and permanent injunctive relief enjoining the aforesaid acts of infringement by Defendants, their officers, agents, servants, employees, subsidiaries, affiliates, divisions, branches, predecessors, successors in business and attorneys, and those acting in concert with Defendants, including related individuals and entities, customers, representatives, original equipment manufacturers, dealers, and distributors;

F.    That this Court enter an award to New Directions of such damages as it shall prove at trial against Defendants that are adequate to compensate New Directions for said infringement, said damages to be no less than a reasonable royalty together with prejudgment interest and costs;

G.    That this Court order an award to New Directions of up to three times the amount of compensatory damages because of Defendants' willful infringement, and any other enhanced damages provided by 35 U.S.C. §284;

H.    That this Court render a finding that this case is "exceptional" and award to New Directions its costs and reasonable attorneys' fees, as provided by 35 U.S.C. §285;

I.    That this Court award New Directions prejudgment interest against Defendants on

36

all sums allowed by law; and

     J.     That this Court grant New Directions such other, further, and different relief as may

be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

     New Directions demands a trial by jury of all matters to which it is entitled to trial by jury

pursuant to Fed. R. Civ. P. 38.


|  |  |
|---|---|
|  | HEYMAN ENERIO |
| OF COUNSEL: | GATTUSO & HIRZEL LLP |
|  |  |
| David L. Hecht | */s/ Dominick T. Gattuso* |
| Delphine W. Knight Brown | Dominick T. Gattuso (# 3630) |
| Yi Wen Wu | 300 Delaware Ave., Suite 200 |
| HECHT PARTNERS LLP | Wilmington, DE 19801 |
| 125 Park Avenue | (302) 472-7300 |
| New York, NY 10017 | dgattuso@hegh.law |
| (212) 851-6821 |  |
| dhecht@hechtpartners.com | *Attorneys for Plaintiff New Directions* |
| dkbrown@hechtpartners.com | *Technology Consulting, LLC* |
| wwu@hechtpartners.com |  |

Dated: April 25, 2025