IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NEW DIRECTIONS TECHNOLOGY CONSULTING, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 25-506 (RGA) |
| ABBOTT LABORATORIES INC. and BIGFOOT BIOMEDICAL, INC., | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS UNDER RULE 12(b)(6)**

OF COUNSEL:

Gregg F. LoCascio, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 389-5000

Benjamin A. Lasky
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

June 27, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.  NATURE AND STAGE OF PROCEEDINGS .................................................................. 2

III.  STATEMENT OF FACTS ............................................................................................... 2

    A.  The '778, '111 and '658 Patents ........................................................................ 3

    B.  The '393 Patent ................................................................................................. 6

    C.  The Asserted Patents Describe And Claim Use Of Conventional Technology ...... 6

IV.  LEGAL STANDARDS ................................................................................................... 7

    A.  Dismissal Under Fed. R. Civ. P. 12(b)(6) .......................................................... 7

    B.  Patentability Under 35 U.S.C. § 101 ................................................................. 8

    C.  Willful Infringement .......................................................................................... 9

V.  ARGUMENT .................................................................................................................. 9

    A.  The Asserted Patents Claim Unpatentable Subject Matter Under § 101 ............... 9

        1.  Representative claims ............................................................................. 9

        2.  *Alice* step 1: The asserted patents claim abstract ideas ............................ 10

        3.  *Alice* step 2: The asserted patents claim no inventive concepts ............... 16

        4.  The Complaint should be dismissed with prejudice ................................. 18

    B.  The Complaint Fails To State A Claim For Willful Infringement ....................... 19

VI.  CONCLUSION .............................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018)................................................................................8

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016)............................................................................1, 2

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
   610 F. Supp. 3d 638 (D. Del. 2022) ................................................. *passim*

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
   97 F.4th 1371 (Fed. Cir. 2024) ....................................................... *passim*

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)....................................................................... *passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................8

*Bilski v. Kappos*,
   561 U.S. 593 (2010)................................................................................8

*BSG Tech LLC v. Beyseasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018)........................................................11, 17

*Chamberlain Grp. v. Techtronic Indus. Co.*,
   935 F.3d 1341 (Fed. Cir. 2019)........................................................2, 14

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019)....................................................... *passim*

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
   859 F.3d 1352 (Fed. Cir. 2017)............................................................8

*Cleveland Med. Devices Inc. v. RedMed Inc.*,
   696 F. Supp. 3d 4 (D. Del. 2023)........................................................20

*Connelly v. Lane Const. Corp.*,
   809 F.3d 780 (3d Cir. 2016)............................................................7, 8

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
    776 F.3d 1343 (Fed. Cir. 2014)..................................................................................9, 13

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)...................................................................... *passim*

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)...........................................................................11

*FairWarning IP, LLC v. Iactric Sys., Inc.*,
    839 F.3d 1089 (Fed. Cir. 2016).............................................................................13

*Fast 101 PTY Ltd. v. Citigroup Inc.*,
    424 F. Supp. 3d 385 (D. Del. 2020) ......................................................................19

*Fast 101 PTY Ltd. v. Citigroup Inc.*,
    834 F. App'x 591 (Fed. Cir. 2020) ........................................................................19

*Finkelman v. Nat'l Football League*,
    810 F.3d 187 (3d Cir. 2016)............................................................................8, 20

*Game Play Network, Inc. v. Potent Sys., Inc.*,
    2025 WL 26737 (D. Del. Jan. 3, 2025)..............................................................2, 19

*Genetic Techs. Ltd. v. Medial L.L.C.*,
    818 F.3d 1369 (Fed. Cir. 2016)..............................................................................8

*iFIT Inc. v. Peloton Interactive, Inc.*,
    2022 WL 609605 (D. Del. Jan. 28, 2022)...................................................... *passim*

*iLife Techs., Inc. v. Nintendo of Am., Inc.*,
    839 F. App'x 534 (Fed. Cir. 2021) .........................................................................2

*Lutz v. Portfolio Recovery Assocs., LLC*,
    49 F.4th 323 (3d Cir. 2022) ..................................................................................7

*Malvern Panalytical Ltd v. TA Instruments-Waters LLC*,
    2021 WL 3856145 (D. Del. Aug. 27, 2021) ...........................................................9

*Mira Advanced Tech. Sys., Inc. v. Google LLC*,
    2022 WL 3925235 (S.D.N.Y. Aug. 31, 2022)..............................................15, 16

*In re Salwan*,
    681 F. App'x 938 (Fed. Cir. 2017) .........................................................................1

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    14 F.4th 1323 (Fed. Cir. 2021) ..............................................................................9

*Universal Secure Registry LLC v. Apple Inc.*,
    10 F.4th 1342 (Fed. Cir. 2021) ................................................................................1

*Wrinkl, Inc. v. Facebook, Inc.*,
    2021 WL 4477022 (D. Del. Sept. 30, 2021)........................................................19

**Statutes**

35 U.S.C. § 101 ...................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(b)(6)..............................................................................1, 7, 8, 18

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

"[P]atent eligibility can be determined at the Rule 12(b)(6) stage when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1346 (Fed. Cir. 2021). On the face of the asserted patents, dismissal based on patent ineligibility under § 101 is appropriate here. As Plaintiff describes them, the asserted patents "cover[] medication outcome assistance and management of other smart healthcare products in patients' hands through medication telemanagement solutions, including many connected combination products, FDA-regulated dosage forms and medical devices."[1] In reality, each patent merely claims abstract ideas of obtaining, communicating, analyzing or storing various data, without any inventive concepts.

Three asserted patents—the '778, '111 and '658 patents—are directed to the abstract idea of exchanging data between a "container" and a "central facility." The remaining patent—the '393 patent—is directed to the abstract idea of detecting whether a user is carrying their "injector" and, if not, sending a "signal" to a "central facility" to generate a "reminder." This is just the type of obtaining and manipulating data, and organization of regular human activity, that courts, including this Court, have repeatedly labeled as abstract at *Alice* step one. *See, e.g.*, *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 610 F. Supp. 3d 638, 646-47 (D. Del. 2022) (Andrews J.), *aff'd* 97 F.4th 1371 (Fed. Cir. 2024); *In re Salwan*, 681 F. App'x 938, 941 (Fed. Cir. 2017); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016). That the patents purport to place these abstract concepts into the telemedicine context is irrelevant, as "[t]he Supreme Court and [Federal Circuit] have repeatedly made clear that merely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less

---

[1]      D.I. 1, ¶ 2.

abstract." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016).

At *Alice* step two, nothing in the patents' claims, informed by their specifications, requires anything more than use of conventional components and functions, without any advance in that technology itself. *See AI Visualize*, 97 F.4th at 1378; *Elec. Power Grp.*, 830 F.3d at 1353-54. That these components and functions are implemented in particular physical environments— a "container," "injector" or "central facility"—does not transform them into patent-eligible inventive concepts. *See, e.g.*, *iLife Techs., Inc. v. Nintendo of Am., Inc.*, 839 F. App'x 534, 537 (Fed. Cir. 2021); *Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1374 (Fed. Cir. 2019). The claims recite no technical improvements to those physical components either.

Accordingly, the Court should dismiss the Complaint, and should do so with prejudice because no amendment could remedy the eligibility deficiencies in the asserted patents themselves. *See, e.g.*, *Game Play Network, Inc. v. Potent Sys., Inc.*, 2025 WL 26737, at *6 (D. Del. Jan. 3, 2025). Additionally, the Court should dismiss Count V—willful infringement—for the independent reason that Plaintiff fails to plausibly allege that Defendants had pre-suit notice of the asserted patents, much less the requisite knowledge of infringement. *See, e.g.*, *iFIT Inc. v. Peloton Interactive, Inc.*, 2022 WL 609605, at *1-2 (D. Del. Jan. 28, 2022).

## II.     NATURE AND STAGE OF PROCEEDINGS

On April 25, 2025, Plaintiff filed its Complaint alleging that Defendants Abbott Laboratories Inc. and Bigfoot Biomedical, Inc. infringe four patents—U.S. Patent Nos. 7,871,393, 8,044,778, 9,149,111, and 8,212,658. Defendants move to dismiss the Complaint with prejudice because the asserted patents claim unpatentable subject matter under § 101 (Section V.A), and the Complaint fails to state a claim for willful infringement (Section V.B).

## III.    STATEMENT OF FACTS

All four asserted patents are related and, to a large extent, share the same fundamental

disclosures.[2] In their "Background" sections, they describe how "government regulations" define requirements for "information" about "medical products," including what must be contained on the "label," as well as "regulatory or procedural regimes" and "[b]est practices" for recording "negative quality experiences, adverse reactions and other information."[3] After describing known medical packaging, product management and telemedicine systems, the patents conclude that:

> It is expected that government regulations, the needs of customers for more information, as well as the desire to provide more features to customers, will result in increasing demands relating to the scope and availability of product information. … Accordingly, there is room for improved communication regarding the status of emergency devices.[4]

## A.    The '778, '111 and '658 Patents

The '778, '111 and '658 patents all purport to relate to methods and systems for communicating between a "central facility" and a "case," or "container," with data collection and reporting ability. The '111 patent states its "present invention" is a "*central facility* that receives data from a *case* for containing [a] medicament, and more particularly, is a *central facility* that receives information from, and sends information to, the *case* via a mobile communication device."[5] The '778 and '658 patents state their "present invention" is "a *case* for [injecting ('778) / containing ('658)] [a] medicament, and more particularly,



is directed to a *case* having data collection and reporting ability that reports events to a *central*

---

[2]    As a continuation-in-part of the '393 patent, the '778 patent shares and supplements the '393 patent's disclosures, while the '111 and '658 patents, as continuations of the '778 patent, share substantially the same disclosures.

[3]    *See, e.g.*, D.I. 1-2 ('778 Pat.) at 1:19-59.

[4]    *Id.* at 1:60-13:30.

[5]    D.I. 1-3 ('111 Pat.) at 1:16-20.

*facility*."[6] The system is shown in Fig. 12C (above), showing "case 800" communicating with "practice management system 26" via "communication network 5" and "external device 850."[7]

Representative (and currently sole asserted) '111 patent claim 1 recites "[a] method for a *central facility* to communicate with a *portable container* via a *mobile device*, comprising" (1) *receiving*, at a computer at the *central facility*, various types of data—usage, environmental and patient—the computer (2) *storing* and *analyzing* that data, and (3) *sending* and *storing* other types of data—action and notice—in response.[8] The dependent claims recite limitations on the container, including the medications it contains and types of sensors and data associated with it (claims 2-13, 15-19), and limitations on the central facility, including the specific action and notice data it generates and stores, and the rules on which it bases that data generation (claims 14, 20-30).

The '778 and '658 patents each claim "container[s]" that communicate with a "central facility." Between them they have 17 independent claims in two general groups, shown in Appendices A and B, respectively. The first group—of which '778 patent claim 1 is representative—recite "[a] *container* for a product comprising" (1) a "*location circuit* for determining the location of the container," (2) a "*storage element* for storing an access code for a central facility, and a container identification code," (3) a "*plurality of data acquisition components* for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product," and (4) "a *communication interface* for generating and sending an event communication signal" including the stored codes, container location, and acquired product characteristics.[9] The other independent claims in this group—'778 patent claims 9, 25, 27,

---

6     D.I. 1-2 ('778 Pat.) at 1:15-18; Ex. 1-4 ('658 Pat.) at 1:17-20.
7     D.I. 1-2 ('778 Pat.), at 19:50-20:20, Fig. 12C.
8     D.I. 1-3 ('111 Pat.), claim 1.
9     D.I. 1-2 ('778 Pat.), claim 1.

4

28, and 29—differ only in that specific product characteristics are acquired (claim 9), a "status indicator" or "control switch" is included (claims 25, 29), and/or the "communication interface" generates and sends certain "exception signals" (claims 27, 28, 29).

The second group of claims—of which '778 patent claim 11 is representative—generally recite equivalent components while (1) specifying the container is for use with "an *external device* having long-range communication capability and short-range communication capability and location sensing capability," replacing the "location circuit" on the container itself, and (2) incorporating a "*processor*" for "producing information and directing the local communication interface to send [] information to the external device," and generating "instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility."[10] The other independent claims in this group—'778 patent claims 14, 21, 22 and 23, and '658 patent claims 1, 8, 9, 10, 11, and 17—differ only in that the "local communication interface" instructs a camera to capture an image ('778 claim 14), the "processor" directs the "local communication device" to send a signal to the "external device" to activate its long-range communication capability ('778 claims 21, 22, 23), specific characteristics are detected by the data acquisition components ('658 patent, all claims), the "external device" is a "practice management system" for dentistry or medicine ('658 claim 8), the "external device" has a "sensor communication interface" with an external sensor ('658 claim 9), and/or the system includes "a mechanism for preventing accidental use of the product" ('658 claim 10).

The '778 and '658 patents' dependent claims recite features of the container including container and sensor types ('778 claims 2-8, 12-13, 15-16, 20, 26, 30-59, 65-70; '658 claims 2-5), use with and limitations on the external device ('778 claims 10, 17-18, 60-64, 71-96; '658 claims

---

[10]    *Id.*, claim 11.

6, 20), and use of other generic components ('778 claims 19, 24; '658 claims 7, 17-19).

**B.    The '393 Patent**

The '393 patent is the earliest of the asserted patents in the family and states that its "present invention relates to managing product information, and more particularly, is directed to creating product information, including, in some cases, product tag information, to reflect the product's history and destination, and then updating the information to reflect product usage and exception events."[11] But the claims as issued relate to an entirely unrelated aspect, set forth almost as an afterthought in several lines of column 15 of the patent, relating to a "central facility" generating a "reminder" for a user to carry an "injector."[12] Specifically, representative (and currently sole asserted) claim 1 recites "[a] central facility" comprising (1) "a *communications interface* for receiving a *signal* relating to an injector," the signal "indicating that the injector is not being carried" and "resulting from a comparison at the injector of two *location reports*," (2) a "*database* for storing a *record* relating to the injector," the record including "contents of the injector," "identity of the person associated with the injector," and a "contact method" for that person, and (3) "*means for generating a reminder* to carry the injector, according to the contact method, in response to the signal."[13] The dependent claims generally specify the inclusion and type of communication interface (claims 2, 9-10), information included in the signal (claim 3), inclusion of certain sensor types (claims 4-5, 8), type of injector (claims 6-7), expression of location data in GPS coordinates (claim 11), and contact method used by the central facility (claims 12-15).

**C.    The Asserted Patents Describe And Claim Use Of Conventional Technology**

To implement these claimed methods and systems, the patents teach use of generic, well-

---

[11]    D.I. 1-1 ('393 Pat.) at 1:5-11.

[12]    *Id.* at 15:28-42.

[13]    *Id.* claim 1.

known components without describing any technological advances in those components. For example, the "central facility" is described as a "[p]roduct management system" that is "embodied as a *general-purpose computer* programmed in accordance with the present description," which "can be one computer or many computers networked together."[14] The "container" is exemplified as a "case" that "holds a medical device or drug product, such [as] an injector" and comprises various generic features such as a lid or cover, bottom part, closures, and "electronics," including a "communication interface" or "communication module."[15] The patent acknowledges such cases were known in the art.[16] The case's "data acquisition components" are exemplified as a standard camera and various types of known sensors.[17] The "injector" may be any known medicament injector, such as a syringe or "well-known" auto-injector.[18] Finally, the "communication network" through which the components exchange data "may be any wireline or wireless network, such as the Internet, a private virtual network, a private dedicated network and so on," and can even be "the public switched telephone network coupled to the cellular telephone network."[19]

## IV.    LEGAL STANDARDS

### A.    Dismissal Under Fed. R. Civ. P. 12(b)(6)

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept all *well-pleaded* factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327-28 (3d Cir. 2022); *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787, 790-91 (3d Cir. 2016). Nonetheless, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[14]    *See, e.g.*, D.I. 1-2 ('778 Pat.) at 4:61-64.
[15]    *See, e.g.*, *id.* at cols. 18 *et seq.*
[16]    *See, e.g.*, *id.* at 2:47-53, 57-64.
[17]    *See, e.g.*, *id.* at 19:16-36.
[18]    *See, e.g.*, D.I. 1-1 ('393 Pat.) at 14:3-6.
[19]    *See, e.g.*, D.I. 1-2 ('778 Pat.) at 20:5-9.

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The Court should not accept "bald assertions," "unsupported conclusions and unwarranted inferences," *Finkelman v. Nat'l Football League*, 810 F.3d 187, 202 (3d Cir. 2016), or allegations "so threadbare or speculative that they fail to cross the line between the conclusory and the factual," *Connelly*, 809 F.3d at 790.

### B.    Patentability Under 35 U.S.C. § 101

"Patentability under 35 U.S.C. § 101 is a threshold legal issue." *AI Visualize*, 610 F. Supp. 3d at 644 (citing *Bilski v. Kappos*, 561 U.S. 593, 602 (2010)). "Accordingly, the § 101 inquiry is properly raised at the pleading stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter." *Id.* (citing *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017)); *see also Genetic Techs. Ltd. v. Medial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016) (noting Federal Circuit has "repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion"). Dismissal is appropriate "when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

Under the two-step eligibility test adopted by the U.S. Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), "[f]irst, the court must determine whether the claims are drawn to a patent-ineligible concept." *AI Visualize*, 610 F. Supp. 3d at 645 (citing *Alice*, 573 U.S. at 217). "If the answer is yes, the court must look to the elements of the claim both individually and as an ordered combination to see if there is an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (quotation marks omitted).

### C.    Willful Infringement

"A determination of willfulness requires a finding of 'deliberate or intentional' infringement." *iFIT*, 2022 WL 609605, at *1 (*citing SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021)). "To state a claim for willful infringement, a pleading must allege, at a minimum: 'facts from which it can be plausibly inferred that the party accused of infringement (1) had knowledge of or was willfully blind to the existence of the asserted patent and (2) had knowledge of or was willfully blind to the fact that the party's alleged conduct constituted, induced, or contributed to infringement of the asserted patent.'" *Malvern Panalytical Ltd v. TA Instruments-Waters LLC*, 2021 WL 3856145, at *2 (D. Del. Aug. 27, 2021) (citation omitted).

## V.    ARGUMENT

### A.    The Asserted Patents Claim Unpatentable Subject Matter Under § 101

Plaintiff's Complaint should be dismissed with prejudice because all claims of the asserted patents merely recite abstract ideas, without any inventive concepts to render them patent-eligible.

#### 1.    Representative claims

A patent claim may be considered "representative" of other claims in an asserted patent where the claims are "substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Here, four claims are representative of all claims in the four asserted patents.

*First*, sole currently asserted claim 1 is representative of all claims in the '111 patent. That claim sets out the steps involved in implementing the abstract idea of communicating between a "container" and a "central facility," including "receiving," "storing," "analyzing," and "sending" various types of data. The remaining claims—all depending from claim 1—are merely directed to generic features of the container and central facility implementing that same abstract idea.

*Second*, as shown in Appendices A and B, '778 patent claims 1 and 11 are representative

of the two groups of claims in the '778 and '658 patents. As described above and further below, those claims relate to the abstract idea of a "container" that can communicate with a "central facility," either directly or through an "external device," and recite the key components of the claimed "container" based on their functions, including storage, data acquisition, processing and communication. All other claims—both independent and dependent—merely specify additional incremental details relating to these same components, implementing the same abstract idea.

*Third*, and finally, sole currently asserted claim 1 is representative of all claims in the '393 patent. As described above and further below, that claim is directed to the abstract idea of determining whether a user is carrying an "injector" by comparing "location reports" and, if not, sending a "signal" to a "central facility" to generate a "reminder." The claim recites the manner in which the determination is made, the signal is sent to the central facility, the information is stored at the central facility, and the means by which a reminder is generated and sent. The remaining claims—all depending from claim 1—are directed to the same abstract idea, and merely specify further details regarding the injector, signal and central facility used to implement the abstract idea.

Notably, the Complaint identifies no distinctions requiring any eligibility analysis beyond these four claims, and instead describes Plaintiff's "portfolio" as a whole in general terms.[20]

## 2. *Alice* step 1: The asserted patents claim abstract ideas

Step one of the *Alice* test looks to the "focus of the claims, their character as a whole." *Elec. Power Grp.*, 830 F.3d at 1353 (internal quotation marks omitted). This entails looking to the specification to understand "the problem facing the inventor" and, ultimately, the described invention. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019). A claim is

---

[20] *See* D.I. 1, ¶¶ 2-5; *see also id.*, ¶¶ 16-20 (section titled "The Patents-In-Suit" identifying patent numbers, titles and issue dates, but providing no detail on the purported inventions). Defendants reserve the right to respond if Plaintiff attempts to identify any purported distinctions.

directed to an abstract idea when neither the claim nor the specification suggests an improvement in the functioning of a computer or other technology or technical field. *See id.* at 771; *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338-39 (Fed. Cir. 2016). Courts generally "compare the claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Id.* at 1334. Importantly, claims to an abstract idea do not become patentable simply by claiming the idea within a narrow technological context or use case. *BSG Tech LLC v. Beyseasons, Inc.*, 899 F.3d 1281, 1287 (Fed. Cir. 2018). Nor does reciting physical components alone make the claim subject matter eligible. *See ChargePoint*, 920 F.3d at 774-75. Indeed, "[e]ven a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims ...." *Id.* at 769.

Applying these principles, each asserted patent merely claims abstract ideas. All four patents describe the same "problem facing the inventor," *i.e.*, that in view of "government regulations, the needs of customers for more information, as well as the desire to provide more features to customers," there will be "increasing demands relating to the scope and availability of product information" and "[a]ccordingly, there is room for an improved product information system."[21] This high level description of the invention—a greater "scope and availability of product information" through an "improved product information system"—is fundamentally abstract with no technological detail whatsoever. And although the patents proceed to set forth columns on implementations of the purported "improved product information system," as described next, "the claim limitations relevant to those supposed improvements are described generically and are themselves either conventional computer functions or abstract ideas

---

[21]    *See, e.g.*, D.I. 1-1 ('393 Pat.) at 3:3-12; D.I. 1-2 ('778 Pat.) at 3:21-30; D.I. 1-3 ('111 Pat.) at 3:24-33; D.I. 1-4 ('694 Pat.) at 3:24-33.

implemented using conventional computer functions." *AI Visualize*, 610 F. Supp. 3d at 646.

      a.    <u>The '111 patent</u>

The '111 patent is directed to the abstract idea of communicating between a "portable container" and a "central facility" through a "mobile device." The preamble of representative (and currently sole asserted) claim 1 recites "[a] method for a *central facility* to communicate with a *portable container* via a *mobile device*." And the remaining claim language demonstrates that this abstract method is implemented through a series of abstract steps, *i.e.*, (1) *receiving*, at a computer at the central facility, various types of data, with the computer then; (2) *storing* and *analyzing* that data, and (3) *sending* and *storing* other data in response.[22] This is just the type of obtaining and manipulating data, "claimed functionally, at a high level of generality," that courts have routinely found to be ineligible abstract concepts. *See, e.g.*, *AI Vizualize*, 97 F.4th at 1378.

The *Electric Power Group* decision is instructive. There, the Federal Circuit considered a method similar to the one at issue here, except in the electric power grid context. The claims recited "[a] method of detecting events on an interconnected electric power grid in real time" comprising: (1) *receiving* various types of data from different sources; (2) *detecting* and *analyzing* events in real-time based on the data; and (3) *displaying* the results of the analysis. 830 F.3d at 1351-52. The court held that "[t]he focus of the asserted claims … is on collecting information, analyzing it, and displaying certain results of the collection and analysis," noting that each such step had previously been held to be abstract. *Id.* at 1353 (citing cases). And because they were not directed to "any particular assertedly inventive technology for performing those functions," the claims were "therefore directed to an abstract idea." *Id.* at 1354. Further, "limiting the claims to the particular technological environment of power-grid monitoring [was], without more, insufficient to

---

[22]    D.I. 1-3 ('111 Pat.), claim 1.

transform them into patent-eligible applications of the abstract idea at their core." *Id.* at 1354.

The same is true here. The '111 patent claims similarly recite steps of receiving and analyzing data without any asserted inventive technology for performing those functions. And although the claims recite additional steps of storing data, and generating action and notice data, the Federal Circuit has held those steps to be abstract as well. *See, e.g.*, *Content Extraction*, 776 F.3d at 1347 ("storing … recognized data in a memory" is an "abstract idea"); *FairWarning IP, LLC v. Iactric Sys., Inc.*, 839 F.3d 1089, 1093-94 (Fed. Cir. 2016) (claims "directed to *collecting and analyzing information* to detect misuse and *notifying a user when misuse is detected*" recite "a combination of … abstract-idea categories"). Finally, that the claims are limited to the particular technological environment of telemedicine is, without more, insufficient to transform the claimed steps into patent-eligible applications of the abstract idea. *See Elec. Power Grp.*, 830 F.3d at 1355.

### b.     The '778 and '658 patents

Unlike the '111 patent, the '778 and '658 patents do purport to claim a physical system, albeit nonetheless abstractly—a "container" that communicates with a "central facility." "But as the Supreme Court indicated in *Alice*, whether a device is 'a tangible system (in § 101 terms, a "machine")' is not dispositive." *ChargePoint*, 920 F.3d at 770 (quoting *Alice*, 573 U.S. at 224). Otherwise, "[r]esolving the § 101 argument … would make the determination of patent eligibility depend simply on the draftsman's art." *Id.* (internal quotation marks omitted). Here, as in *ChargePoint*, "[t]he only improvement alleged is use of the concept of network communication to interact with the particular devices" claimed—the "container" and "central facility"—and "[t]his remains the focus of these [] claims, thus making [all] directed to an abstract idea." *Id.* at 772-73.

In *CardioNet LLC v. InfoBionic, Inc.*, the Federal Circuit found similar claims unpatentable. In that case, the claims recited "[a] system for reporting information related to arrhythmia events," comprising various physical components including a "monitoring system

configured to process and report physiological data," a "monitoring station for receiving the physiological data" and a "processing system configured to receive arrhythmia information" from the monitoring system. 816 F. App'x 471, 473 (Fed. Cir. 2020). The Federal Circuit concluded that "the claims are directed to collecting, analyzing, and displaying data, which [that court had] repeatedly held to be abstract concepts." *Id.* at 475 (citing cases). That the claims included physical components did not alter the outcome because "the claims and specifications treat those steps [performed by the physical components] as conventional processes, and therefore the claims cannot be said to require anything more than generic data analysis." *Id.*

The same is true here. Although the claims recite a physical system ("container") with physical components ("storage element," "data acquisition components," "communication interface," "processor," "control switch," "status indicator"), the functions performed by those components are described as conventional processes involved in generic data collection, storage, analysis and communication, quintessential abstract ideas. *See Chamberlain Grp.*, 935 F.3d at 1348 ("Without more, the mere physical nature of CGI's claim elements (*e.g.*, controller, interface, and wireless data transmitter) is not enough to save the claims from abstractness, where the claimed advance is directed to the wireless communication of status information using off-the-shelf technology for its intended purpose"). Furthermore, "the specification never suggests that the [container] itself is improved from a technical perspective, or that it would operate differently than it otherwise could. Nor does the specification suggest that the invention involved overcoming some sort of technical difficulty in adding networking capability to the [container]." *ChargePoint*, 920 F.3d at 768 (claims to "network-controlled charging stations" recite abstract ideas).

c.    The '393 patent

Finally, the '393 patent is directed to the abstract idea of determining whether a user is carrying their injector based on comparing location reports and, if not, sending a signal to a central

facility to generate a reminder. These claims are materially indistinguishable from others found to cover only abstract ideas at the motion to dismiss stage.

In *CalAmp Wireless Networks Corp. v. ORBCOMM, Inc.*, the district court considered the eligibility under § 101 of a patent directed to "a system and method for tracking an object by determining whether the object is presently located within a prescribed geographic area and taking appropriate action depending on whether the object is or is not within that area." 233 F. Supp. 3d 509 (E.D. Va. 2017). The court held the claims were "directed towards the abstract idea of information collection and analysis," noting the patent "simply requires a user to collect information about an object's current position and required position, analyze that information by comparing the current and required positions, and then respond to that information." *Id.* at 513. The court concluded that "the claims here are focused on a combination of abstract-idea processes," noting that "humans have forever been using the method of the [asserted patent] to determine if they, or some other object, is in the right place at the right time" and "[t]his patent … merely automates that process." *Id.* Another court similarly found claims to a device that uses on-board GPS to determine its spatial zone and display task reminders to claim only abstract ideas. *See Mira Advanced Tech. Sys., Inc. v. Google LLC*, 2022 WL 3925235 (S.D.N.Y. Aug. 31, 2022).

Here too, the system of the claims "collect[s] information about an object's current position and required position" (injector "location reports"), "analyze[s] that information by comparing the current and required positions" (determining if the injector is being carried by comparing location reports), and then "respond[s] to that information" (either does nothing if the injector is being carried or, if not, sends a "signal" to a "central facility," which generates a "reminder"). Nothing in the claims describes technological improvements to the components performing these functions.

Moreover, the '393 patent claims merely purport to automate a process humans have been

conducting for eternity—checking whether someone is carrying an object they should be carrying and, if not, reminding them to do so. *See CalAmp*, 233 F. Supp. 3d at 513; *Mira Advanced Tech.*, 2022 WL 3925235, at \*5. In fact, if anything, the '393 patent claims are more abstract than those at issue in *CalAmp* and *Mira Advanced Tech.* because they do not require use of computers at all. Rather, the claims would seemingly cover a call center ("central facility") with a filing cabinet containing records of Epipen users, including their identity, dosage, and contact details such as their schools' phone numbers ("database for storing a record relating to the injector"), and a telephone for receiving a call ("communication interface for receiving a signal") from a concerned parent who has noticed their child's Epipen that was on the kitchen counter before their child went to school is still on the kitchen counter after the child has left ("the signal resulting from a comparison at the injector of two location reports of the injector"), leading the call center to telephone the child's school to remind the child to carry the Epipen ("generating a reminder to carry the injector, according to the contact method, in response to the signal …")[23].

### 3.    *Alice* step 2: The asserted patents claim no inventive concepts

At *Alice* step two, none of the asserted patents' claims recite elements that, either individually or in combination, would provide an "inventive concept." *See Alice*, 573 U.S. at 217-18. "Simply appending conventional steps, specified at a high level of generality [is] not enough to supply [an] inventive concept." *Id.* at 222 (cleaned up). That is all the asserted patents do here.

For example, the only physical components recited in representative '111 patent claim 1 are a "central facility" with a "computer" on the one hand, and a "portable container" comprising various "sensors" on the other. But neither the claims nor the specification requires use of anything other than "generic technical components" to meet these elements. For example, the patent teaches

---

[23]    D.I. 1-1 ('393 Pat.), claim 1.

that the "central facility" is "embodied as a *general-purpose computer* programmed in accordance with the present description," yet provides no particular novel algorithm or programming to perform the recited functions.[24] Nor does the patent purport to describe technological advances in the way containers contain products or sensors sense product characteristics—they are described as performing those functions in the same way they always have.[25] Finally, the dependent claims merely recite known features of containers, product data, sensors and central facilities, with no inventive concepts.[26] The claims therefore fail *Alice* step two. *See BSG*, 899 F.3d at 1290-91 ("If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea"); *CardioNet*, 816 F. App'x at 476 ("[T]he steps themselves recite conventional data processing functions, such as obtaining data, analyzing the data to identify features therein, and displaying the data, and do not recite any specific or inventive steps for doing so.").

Similarly, the only physical components of the "container" recited in the representative '778 and '658 patent claims—"location circuit," "storage element," "data acquisition components," "communication interface," "processor," "control switch," "status indicator"—are merely generic, off-the shelf components (GPS, memory, sensors, transceiver, processor, switch, etc.). Neither the patents' specifications nor their claims purport to describe improvements to those components. Nor, as discussed above, do the patents purport to describe any improvement in the way the claimed containers contain products. At bottom, "[h]ere, the claims do nothing to improve how [containers] function; instead, the claims merely add generic networking capabilities to those [containers] and say 'apply it.'" *ChargePoint*, 920 F.3d at 774-75; *see also, e.g.*, *CardioNet*,

---

[24]    D.I. 1-3 ('111 Pat.) at 4:43-45; *see also id*, generally.
[25]    *Id.* at cols. 18-42.
[26]    *Id.*, claims 2-30.

816 F. App'x at 476 ("While some claims are cast as systems and articles, they are implemented on generic 'monitoring systems,' 'monitoring stations,' and 'processing systems' which, according to the specification, can be implantable medical devices and computing systems. Ultimately, the claims depend on methods that can be performed on any general-purpose computing device without reciting or requiring any nonconventional components.").

Finally, the only physical components of the "central facility" recited in the '393 patent are a "communications interface," a "database for storing a record," and "means for generating a reminder." But even to the extent those features are implemented using a computer—rather than a call center, telephone, file cabinet and concerned parent (*see* Section 2.c, *supra*)—the patent, again, teaches only use of "a general-purpose computer" for the "central facility" and describes no novel components, algorithms or programming for implementing its functions.[27] Nor does representative claim 1, or any of the dependent claims, purport to describe any improvement in the functionality of the "injector" that is the subject of the reminder.[28] Thus, the '393 patent "does not provide any inventive material to elevate it beyond an attempt to patent the abstract idea of determining whether an object [an injector] is in the right place at the right time." *CalAmp*, 233 F. Supp. 3d at 515.

### 4.     The Complaint should be dismissed with prejudice

Under these circumstances, because the asserted patents claim only abstract ideas without any inventive concepts, all claims of the patents are invalid under § 101, and the Complaint should be dismissed for failure to state a claim under Rule 12(b)(6). *See, e.g.*, *AI Visualize*, 610 F. Supp 3d at 644. Furthermore, no pleading amendment can change the ineligibility of the claimed subject matter, the Court should dismiss the Complaint with prejudice without leave to amend. *See, e.g.*,

---

[27]     D.I. 1-1 ('393 Pat.) at 4:19-23; *see also id.* at 15:28-47.
[28]     *Id.*, claim 1; *see also id.* at 13:62-14:22, claims 2-15.

*Game Play Network*, 2025 WL 26737, at \*7 (denying leave to amend complaint); *see also Fast 101 PTY Ltd. v. Citigroup Inc.*, 424 F. Supp. 3d 385, 393 (D. Del. 2020), *aff'd,* 834 F. App'x 591 (Fed. Cir. 2020) (denying leave to amend as "futile").

**B.    The Complaint Fails To State A Claim For Willful Infringement**

The Court also should dismiss Count V of the Complaint—willful infringement—for the additional reason that it fails to plausibly demonstrate that Defendants had pre-suit knowledge of the patents-in-suit, much less knowledge of infringement. *See, e.g., iFIT*, 2022 WL 609605 at \*2.

*First*, Plaintiff's unsupported averments are insufficient to plausibly allege that Defendants had pre-suit knowledge of the asserted patents. Plaintiff pleads only two purported facts in support of its allegation—neither of which is even alleged to be a communication to the Defendants: (1) that nine-plus years ago, on January 20, 2016, Plaintiff's Managing Director Napoleon Monroe presented on the "Benefits of IP Partnering for Drug Delivery Telemanagement" at a Drug Delivery Partnerships Conference, and (2) that Mr. Monroe discussed Plaintiff's patent portfolio in a June 30, 2021 article on the website www.ondrugdelivery.com.[29] Plaintiff accompanies these alleged facts with only bald speculation—"[u]pon information and belief"—that Defendants' unnamed "representatives" attended Mr. Monroe's presentation, and Defendants are subscribers to ONdrugDelivery.[30] But Plaintiff identifies no such information, nor the basis for any such belief. It provides no records of attendance at the conference or website subscriptions. Nor does it identify Defendants' representatives who are alleged to have attended the presentation and/or read the article, let alone show that their role with Defendants is such that it could plausibly implicate them in the "bad state of mind" required for willfulness. *See Wrinkl, Inc. v. Facebook, Inc.*, 2021 WL

---

[29]    D.I. 1, ¶¶ 210, 212-13, 215-16.
[30]    *Id.*, ¶¶ 211, 214.

4477022, at *7 (D. Del. Sept. 30, 2021). While the Court must accept "well-pleaded" facts as true, it need not accept the "bald assertions" Plaintiff presents here. *See Finkelman*, 810 F.3d at 202.

*Second*, "[e]ven if [Plaintiff] had sufficiently alleged knowledge of the [asserted patents], mere knowledge of the patent[s] cannot support an allegation of willful infringement"; rather Plaintiff "must plead *both* knowledge of the patent *and of the infringement*." *iFIT*, 2022 WL 609605, at *2 (citation omitted). Plaintiff's Complaint fails on that basis too. Plaintiff merely asserts, without support, that "Abbott Labs and Bigfoot Biomedical have been and continue to be willful infringers of the Asserted Patents" and "[w]ith knowledge of the 393, 778, 111 and 658 Patents and their own infringing conduct, Abbott Labs and Bigfoot Biomedical willfully continues to infringe the 393, 778, 111 and 658 patents."[31] That is insufficient, and courts in this District have routinely dismissed similarly conclusory willfulness allegations. *See, e.g., iFIT*, 2022 WL 609605, at *2 ("iFIT alleges that despite Peloton's knowledge of the patent, it continues to sell the infringing Bike+ product. This is insufficient.") (internal citation omitted); *Cleveland Med. Devices Inc. v. RedMed Inc.*, 696 F. Supp. 3d 4, 14 (D. Del. 2023) ("CleveMed's claim stands on its conclusory allegation that 'CleveMed is informed and believes that, despite ResMed's notice and knowledge of the Asserted Patents and CleveMed's patented technology, ResMed made the deliberate decision to sell products and services that it knew infringes CleveMed's Asserted Patents.' … But that allegation is insufficient to plead knowledge of infringement.").

For both of these reasons, Plaintiff's willfulness allegations should be dismissed.

## VI. CONCLUSION

Plaintiff's Complaint should be dismissed in its entirety with prejudice.

---

[31] D.I. 1, ¶¶ 217-18.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

OF COUNSEL:

Gregg F. LoCascio, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 389-5000

Benjamin A. Lasky
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

June 27, 2025

*Attorneys for Defendants*

## Appendix A: '778/658 Patent Group 1 Claims[32]

| '778 Patent | | | | | |
|---|---|---|---|---|---|
| **Claim 1** | **Claim 9** | **Claim 25** | **Claim 27** | **Claim 28** | **Claim 29** |
| A container for a product, comprising: | A container for a product, comprising: | A container for a product, comprising: | A container for a product, comprising: | A container for a product, comprising: | A container for a product, comprising: |
| | | *a status indicator for indicating whether the product has been used,* | | | |
| | | | | | *a control switch* |
| a location circuit for determining the location of the container, | a location circuit for determining the location of the container, | a location circuit for determining the location of the container, | a location circuit for determining the location of the container, | a location circuit for determining the location of the container, | a location circuit for determining the location of the container, |
| a storage element for storing an access code for a central facility, and a container identification code, | a storage element for storing an access code for a central facility, and a container identification code, | a storage element for storing an access code for a central facility, and a container identification code, | a storage element for storing an access code for a central facility, and a container identification code, | a storage element for storing an access code for a central facility, and a container identification code, | a storage element for storing an access code for a central facility, and a container identification code, |
| a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, one of the characteristics indicating use of the product, and | a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, *at least one of the characteristics indicating lack of use of at least one of the container and the product,* and | a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, and | a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, and | a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, and | a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, and |
| a communication interface for generating and sending an event communication signal including | a communication interface for generating and sending an event communication signal including | a communication interface for generating and sending an event communication signal including | a communication interface for generating and sending an event communication signal including | a communication interface for generating and sending an event communication signal including | a communication interface for generating and sending an event communication signal including |
| (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, |
| (b) the container identification code from the storage element, | (b) the container identification code from the storage element, | (b) the container identification code from the storage element, | (b) the container identification code from the storage element, | (b) the container identification code from the storage element, | (b) the container identification code from the storage element, |

---

[32]     Elements that differ from representative '778 patent claim 1 are highlighted in red.

| (c) the location of the container from the location circuit, and | (c) the location of the container from the location circuit, and | (c) the location of the container from the location circuit, and | (c) the location of the container from the location circuit, and | (c) the location of the container from the location circuit, and | (c) the location of the container from the location circuit, and |
|---|---|---|---|---|---|
| (d) the status of the at least two characteristics from the data acquisition components. | (d) the status of the at least two characteristics from the data acquisition components. | (d) the status of the at least two characteristics from the data acquisition components. | (d) the status of the at least two characteristics from the data acquisition components, | (d) the status of the at least two characteristics from the data acquisition components, | (d) the status of the at least two characteristics from the data acquisition components, |
| | | | *wherein the communication interface is also for generating and sending an exception signal indicating that a user of the container requests communication* | *wherein the communication interface is also for generating and sending an exception signal indicating that the product has been removed from the container a predetermined number of times.* | *wherein the communication interface is also for generating and sending an exception signal indicating that the control switch has been activated.* |
| | | | | | |

2

## Appendix B: '778/'658 Patent Group 2 Claims[33]

| | '778 Patent | | | | '658 Patent | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Claim 11 | Claim 14 | Claim 21 | Claim 22 | Claim 23 | Claim 1 | Claim 8 | Claim 9 | Claim 10 | Claim 11 | Claim 17 |
| A container for a product, | A container for a product, | A container for a product, | A container for a product, | A container for a product, | A container for a product, | *The container of claim 1 [sic], A container for a product,* | A container for a product, | A container for a product, | A container for a product, | A container for a product, |
| the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising: | the container for use with an external device having a camera, long-range communication capability and short-range communication capability and location sensing capability, comprising: | the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising: | the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising: | the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising: | the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising: | the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising: | the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising: | the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising: | the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising: | the container for use with an external device having long-range communication capability and short-range communication capability and location sensing capability, comprising: |
| a status indicator for indicating whether the product has been used, | *[no status indicator recited]* | *[no status indicator recited]* | *[no status indicator recited]* | *[no status indicator recited]* | *[no status indicator recited]* | *[no status indicator recited]* | *[no status indicator recited]* | *[no status indicator recited]* | *[no status indicator recited]* | *[no status indicator recited]* |
| a storage element for storing an access code for a central facility and a container identification code, | a storage element for storing an access code for a central facility and a container identification code, | a storage element for storing an access code for a central facility and a container identification code, | a storage element for storing an access code for a central facility and a container identification code, | a storage element for storing an access code for a central facility and a container identification code, | a storage element for storing an access code for a central facility and a container identification code, | a storage element for storing an access code for a central facility and a container identification code, | a storage element for storing an access code for a central facility and a container identification code, | a storage element for storing an access code for a central facility and a container identification code, | a storage element for storing an access code for a central facility and a container identification code, | a storage element for storing an access code for a central facility and a container identification code, |
| | | | | | | | | | *a switch for activation by a user to produce* | *a switch for activation by a user to produce* |

---

[33]     Elements that differ from representative '778 patent claim 11 are highlighted in red.

| | | | | | | | | | *an activation signal,* | *an activation signal,* |
|---|---|---|---|---|---|---|---|---|---|---|
| a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, | a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, | a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, | a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, | a plurality of data acquisition components for acquiring status of at least two characteristics of at least one of the container, the product and a user of the product, | *a first data acquisition component for detecting that the container has been opened,* | *a first data acquisition component for detecting that the container has been opened,* | *a first data acquisition component for detecting that the container has been opened,* | *a first data acquisition component for detecting that the container has been opened,* | | |
| | | | | | *a second data acquisition component for sensing an identity of a nearby person, the nearby person being a member of a group registered at a central facility, the container identification code not uniquely associated with a member of the group,* | *a second data acquisition component for sensing an identity of a nearby person, the nearby person being a member of a group registered at a central facility, the container identification code not uniquely associated with a member of the group,* | *a second data acquisition component for sensing an identity of a nearby person, the nearby person being a member of a group registered at a central facility, the container identification code not uniquely associated with a member of the group,* | *a second data acquisition component for sensing an identity of a nearby person, the nearby person being a member of a group registered at a central facility, the container identification code not uniquely associated with a member of the group,* | *a data acquisition component for sensing an identity of a nearby person, the nearby person being a member of a group registered at a central facility, the container identification code not uniquely associated with a member of the group,* | *a data acquisition component for sensing an identity of a nearby person, the nearby person being a member of a group registered at a central facility, the container identification code not uniquely associated with a member of the group,* |
| | | | | | *a third data acquisition component for sensing use of the product,* | | | | *a data acquisition component for sensing use of the product,* | |
| a local communication interface for communicating with the external device using the short-range communication capability of the external device, and | a local communication interface for communicating with the external device using the short-range communication capability of the external device, and | a local communication interface for communicating with the external device using the short-range communication capability of the external device, and | a local communication interface for communicating with the external device using the short-range communication capability of the external device, and | a local communication interface for communicating with the external device using the short-range communication capability of the external device, and | a local communication interface for communicating with the external device using the short-range communication capability of the external device, and | a local communication interface for communicating with the external device using the short-range communication capability of the external device, and | a local communication interface for communicating with the external device using the short-range communication capability of the external device, and | a local communication interface for communicating with the external device using the short-range communication capability of the external device, and | a local communication interface for communicating with the external device using the short-range communication capability of the external device, | a local communication interface for communicating with the external device using the short-range communication capability of the external device, and |
| a processor for producing information and | *[no processor recited]* | a processor for producing information and | a processor for producing information and | a processor for producing information and | a processor for producing information and | a processor for producing information and | a processor for producing information and | a processor for producing information and | a processor for producing information and | a processor for producing information and |

| directing the local communication interface to send the information to the external device, the information including: | | directing the local communication interface to send the information to the external device, the information including: | directing the local communication interface to send the information to the external device, the information including: | directing the local communication interface to send the information to the external device, the information including: | directing the local communication interface to send the information to the external device, the information including: | directing the local communication interface to send the information to the external device, the information including: | directing the local communication interface to send the information to the external device, the information including: | directing the local communication interface to send the information to the external device, the information including: | directing the local communication interface to send the information to the external device, the information including: | directing the local communication interface to send the information to the external device, the information including: |
|---|---|---|---|---|---|---|---|---|---|---|
| | *for producing an instruction to a user of the external device to use the camera to capture at least one image, for producing information, and for directing the local communication interface to send the information to the external device, the information including:* | | | | | | | | | |
| (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, | (a) the access code for the central facility, |
| (b) the container identification code, | (b) the container identification code, | (b) the container identification code, | (b) the container identification code, | (b) the container identification code, | (b) the container identification code, | (b) the container identification code, | (b) the container identification code, | (b) the container identification code, | (b) the container identification code, | (b) the container identification code, |
| (c) the status of at least two characteristics from the data acquisition components, | (c) the status of at least two characteristics from the data acquisition components, | (c) the status of at least two characteristics from the data acquisition components, | (c) the status of at least two characteristics from the data acquisition components, | (c) the status of at least two characteristics from the data acquisition components, | *(c) the detection that the container has been opened,* | *(c) the detection that the container has been opened,* | *(c) the detection that the container has been opened,* | *(c) the detection that the container has been opened,* | *(c) the activation signal,* | *(c) the activation signal,* |

5

| | | | | | *(d) the sensed use of the product,* | | | | *(e) the sensed use of the product, and[34]* | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | *(e) the sensed identity of the nearby person, and* | *(d) the sensed identity of the nearby person, and* | *(d) the sensed identity of the nearby person, and* | *(d) the sensed identity of the nearby person, and* | *(d) the sensed identity of the nearby person,* | *(d) the sensed identity of the nearby person, and* |
| (d) instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility along with (b) and (c), using its long-range communication capability and (a). | (d) instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility along with (b) and (c) *and the at least one captured image to the central facility*, using its long-range communication capability and (a). | (d) instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility along with (b) and (c), using its long-range communication capability and (a), | (d) instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility along with (b) and (c), using its long-range communication capability and (a), | (d) instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility along with (b) and (c), using its long-range communication capability and (a), and | (f) instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility *(original)*. | (e) instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility, | (e) instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility, | (e) instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility, and | (f)instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility. | (e) instructions for the external device to use its location sensing capability to sense its location and to report its sensed location to the central facility, |
| | | | | *a control switch,* | | | | | | |
| | | *wherein the processor is also for directing the local communication device to send a signal to the external device to activate its long-range communication capability, the signal indicating that a user of the container* | *wherein the processor is also for directing the local communication device to send a signal to the external device to activate its long-range communication capability, the signal indicating that the product has been* | *wherein the processor is also for directing the local communication device to send a signal to the external device to activate its long-range communication capability, the signal indicating that the control* | | | | | | |

---

[34]    In claim 11, the order of some of the information produced by the processor is reversed compared to claim 1. The claim has been reformatted to align common claim elements.

| | | *requests communication.* | *removed from the container a predetermined number of times.* | *switch has been activated.* | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | *wherein the external device is a practice management system for at least one of dentistry and medicine.* | | | |
| | | | | | | *wherein the external device has a sensor communication interface for communicating with an external sensor to receive a reading, and wherein the processor is also for directing the local communication device to send an instruction to the external device to send the reading from the external sensor to the central facility.* | | | |
| | | | | | | | *a mechanism for preventing accidental use of the product while the product is being removed from the container.* | | |
| | | | | | | | | | |

7

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 27, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 27, 2025, upon the following in the manner indicated:

Dominick T. Gattuso, Esquire                          *VIA ELECTRONIC MAIL*
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE  19801
*Attorneys for Plaintiff*

David L. Hecht, Esquire                               *VIA ELECTRONIC MAIL*
Delphine W. Knight Brown, Esquire
Yi Wen Wu, Esquire
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, NY  10017
*Attorneys for Plaintiff*


                                        */s/ Rodger D. Smith II*
                                        _____
                                        Rodger D. Smith II (#3778)